**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| |
|---|
| FRANCES JEAN-LOUIS, |
| |
|             Plaintiff, |
| |
|   v. |
| |
| RGIS INVENTORY SPECIALISTS, LLC, |
| |
|             Defendant. |

Civil Action

No.  08-2662

Pollak, J.                                                                 August 18, 2011

## OPINION

Plaintiff Frances Jean-Louis, an African-American woman, brings this civil action under both state and federal anti-discrimination statutes against her former employer, RGIS Inventory Specialists, LLC ("RGIS").  She alleges that RGIS treated her unfairly because of her race and improperly classified her work to avoid paying her overtime. Before the court now is RGIS's motion for summary judgment.

## I.  Background

RGIS is an inventory specialist that performs, among other things, audits of retail stores to provide an accurate merchandise count.  As alleged in the amended complaint, RGIS hired Jean-Louis as an auditor in January 2005.  Am. Compl. at ¶ 5.  As an auditor,

she was responsible for counting merchandise at the stores RGIS serviced.  Jean-Louis

Dep. Tr. 1 74:11–75:12.[1]  In Spring 2005, Jean-Louis was promoted to team leader, a

supervisory role in which she managed some of the smaller stores.  *Id*. at 77:7–81:3.  In

this role she reported to two Area Managers ("AMs"): Naim Caleb, an African-American

man; and Isaac Brown, a Caucasian man.  *Id*. at 105:5–12.  The AMs, in turn, were

supervised by District Manager ("DM") Jay Gritz, a Caucasian man.  *Id.* at 105:1–4.

In late 2005, Brown left his AM position, and Jean-Louis was promoted to fill it on

December 31, 2005.  Gritz Dep. Tr. 23:17–24:2; Jean-Louis Dep. Tr. 1 106:24–107:17.

As an AM, Jean-Louis was the most senior RGIS employee at an inventory job site, Jean-

Louis Dep. Tr. 1 91:10–13, earned a salary of "$33,800 per year," Am. Compl. at ¶ 7, and

had responsibilities both before and during inventories.  Before an inventory, she was

responsible for making pre-inventory visits with customers to prepare for the inventory,

planning the audit, and ensuring that all necessary equipment was on-site.  Jean-Louis

Dep. Tr. 2 at 132:15–24.  During an inventory, her primary responsibility was supervising

auditors, but she also (a) communicated with customers and (b) trained auditors.  *Id.* at

28:7–10.  In total, she trained around fifteen auditors during her time as an AM, and

"groom[ed]" two auditors to be team leaders.  *Id.* at 29:10–13.  She had the authority to

dismiss auditors from the job site, Jean-Louis Dep. Tr. 2 at 43:3–45:21, but did not have

---

[1] Jean-Louis was deposed twice: first, on April 20, 2010; and second, on July 1,
2010.  The court refers to these depositions as "Jean-Louis Dep. Tr. 1," and "Jean-Louis
Dep. Tr. 2," respectively.

the authority to hire or fire, Gritz Dep. Tr. 77:3–16.  Jean-Louis's first two positions,

auditor and team leader, were hourly; her job as AM was salaried.  Gritz Dep. Tr.

150:15–16.

      According to District Manager Gritz, Jean-Louis's performance as AM was

inadequate from the very beginning.  The first three examples of alleged unprofessional

behavior are as follows:

1.      On January 7, 2006, Gritz reprimanded Jean-Louis for "eliminat[ing] areas
from the range check to make it appear as if there was nothing missing."
Docket No. 52 Ex. 9 at 3 (first internal complaint by Jean-Louis).  Jean-
Louis testified that she was not doing what Gritz accused her of; rather, she
"was trying to see what was out there, to double check." Jean-Louis Dep.
Tr. 1 262:4–5.

2.      Later that month, on January 31, 2006, Jean-Louis did not arrive for an
inventory and it had to be cancelled.  *Id.* at 272:5–9.  She explained that she
was working off of an old version of the schedule with a later start time.  *Id.*
at 271:18–272:9.

3.      On February 22, 2006, Jean-Louis arrived late for RGIS's first inventory
with a customer.  *Id.* at 258:23–259:2.  She explained that she was late
because she "had another inventory the night before" and that Gritz "was
running [the] inventory, not [her]." *Id.*  Nonetheless, she admitted that "[i]t

wasn't okay" for her to arrive late.  *Id.*  The next day, she was 40 minutes

late for an inventory because of "traffic."  Jean-Louis Dep. Tr. 2 at

208:18–24.

In sum, although she disagreed with Gritz's characterization of her work, Jean-Louis

knew that Gritz was unhappy with her performance as AM during her first few months in

the position.  *See* Jean-Louis Dep. Tr. 1 263:11–16 (testifying that Gritz had expressed

displeasure with her performance on January 7, 2006); *id.* at 279:9–13 (testifying that

Gritz was "none too happy" with her performance before March 30, 2006); Docket No.

52 Ex. 5 (First Performance Improvement Plan).

On March 30, 2006, Gritz told Jean-Louis that he wanted to speak with her.  Gritz

said that he told Jean-Louis that the meeting was to discuss her "performance issues,"

Docket No. 52 Ex. 9 at 3, but Jean-Louis does not remember what Gritz said the meeting

was about, Jean-Louis Dep. Tr. 1 257:16–19.  That same day, Jean-Louis made a formal

complaint to RGIS's Human Resources ("HR") department (the "first internal

complaint").  According to internal records, which Jean-Louis confirms were a complete

and accurate description of her complaint, *id.* at 244:19–22, 245:8–12, she alleged that

Gritz: (1) "cursed at her on several occasions"; (2) "threaten[ed] to terminate her

employment and undermin[ed] her authority in front of customers and team members";

(3) "yelled at her in front of the team"; (4) told her that "she does not know what she is

doing"; (5) "does not give her the opportunity to run inventories solo"; (6) threatened to

4

terminate her employment unless she "purchase[d] a new cell phone . . . by the end of the business day"; (7) "threaten[ed] to kick her out of [a] inventory"; and (8) was "trying to jeopardize her employment in order to promote another employee to the AM position," Docket No. 52 Ex. 9 at 1–2.  Her formal complaint did not allege that these actions were motivated by her race; indeed, it made no mention of race.  *See id.*

Gritz gave Jean-Louis a Performance Improvement Plan on May 9, 2006 (the "first PIP").  The PIP documented: (1) four instances of insubordination or uncooperative behavior; (2) twelve examples of missed deadlines; and (3) ten instances of poor communication.  *See* Docket No. 52 Ex. 5 (first PIP).  Jean-Louis testified that the behavior outlined in the first PIP generally occurred, but argued that her actions were not fairly characterized.  Jean-Louis Dep. Tr. 2 198:17–244:3.  For example, she agreed that she did not attend a scheduled inventory, but pointed out that she had just "worked an all-night inventory" and did not have the strength to participate.  *Id.* at 205:8–206:3.

The months after the first PIP were, according to Gritz, "kind of quiet"; "[Jean-Louis] . . . just went and did her stuff and I tried not to have any conversations with her because it was pointless."  Gritz Dep. Tr. 139:6–21.  But the quiet did not last: on October 9, 2006, Jean-Louis made a second formal complaint about Gritz (the "second internal complaint") to HR.  According to internal records, Jean-Louis alleged that Gritz: (1) "made comments to her that [were] inappropriate and verbally abusive"; (2) "made a very

5

offensive explicit comment to her";[2] (3) told her she was "useless"; (4) assigned her the "most inexperienced and slow auditors," and explained his behavior by alleging that "no one wants to work with her"; and (5) "told her she should have called him first" after she left a store early because she was not feeling well even though she had the other AM's permission to leave.  *See* Docket No. 52 Ex. 10 (second internal complaint).  The second internal complaint contained no allegation of racial bias, and Jean-Louis testified that RGIS's record of that complaint was complete to the best of her knowledge.  Jean-Louis Dep. Tr. 1 129:16–19.

Gritz gave Jean-Louis a second Performance Improvement Plan on December 1, 2006 (the "second PIP").  *See* Docket No. 52 Ex. 6 (second PIP).  The second PIP focused on Jean-Louis's alleged poor communication, and cited 23 instances where a lack of communication undermined productivity.  *See id.*  Gritz concluded by stating that "[he does] not have any plans for [Jean-Louis's] improvement" because "[t]oo much time has gone by without [Jean-Louis] making the needed modifications in [her] communication and overall performance."  *Id.* at 2.  Gritz followed the second PIP with a planned field evaluation in early December.  Gritz rated Jean-Louis as unsatisfactory in new sales, profits, employee development, and leadership and management; he wrote that she met expectations in customer service.  Docket No. 52 Ex. 7 (RGIS Field Evaluation).

---

[2] The second internal complaint does not specify what the comment was, but according to Jean-Louis, "Gritz told [her] to suck his private parts."  Jean-Louis Dep. Tr. 2 287:12–288:3.

6

On December 4, 2006, Jean-Louis called in sick from an inventory around noon, three hours after it was scheduled to begin. *See* Docket No. 52 Ex. 11 at 1 (email from Gritz to Melissa Jent, RGIS Operations Manager). A few minutes later, at 12:20 PM, Jean-Louis faxed in her response to the field evaluation from an OfficeMax location. *See id* at 4 (fax from Jean-Louis to Jent). In the fax, Jean-Louis alleged that while the "statistical analysis . . . was fair," Gritz's "interpretations and comments show[] a lack of integrity and honesty." *Id*.

RGIS terminated Jean-Louis's employment on December 13, 2006. *See* Docket No. 54 Ex. 6 (Jean-Louis's agency charge of discrimination). According to Gritz, RGIS terminated her for incompetence because she "fail[ed] to communicate" and was unable "to perform the functions of her job." Gritz Dep. Tr. 34:14–18. A little over a year later, on December 20, 2007, Jean-Louis filed an administrative charge of discrimination with the Pennsylvania Human Relations Commission and the U.S. Equal Employment Opportunity Commission ("EEOC").[3] *See* Docket No. 54 Ex. 6. She claimed that she was "discriminated against because of [her] race," and cited the treatment of two other employees, Latisha Johnson and Joel Abboud, who "had similar performance issues and were not discharged." *Id.* Johnson is an African-American woman, and Abboud is a

---

[3] Jean-Louis submitted a letter to the EEOC on July 31, 2007, that alleged discrimination by RGIS. The EEOC informed Jean-Louis that her letter was insufficient for filing a charge of discrimination, and Jean-Louis then filed a charge of discrimination on December 20, 2007. *See* Docket No. 40 at 2–3 (memorandum opinion denying RGIS's motion to dismiss).

Caucasian man.  Both worked as Associate Area Managers ("AAMs"), an hourly position below AM, during Jean-Louis's time with RGIS.  Gritz Dep. Tr. 163:21–164:4, 166:17–20; Jean-Louis Dep. Tr. 2 164:4–9.  RGIS promoted Johnson from AAM to AM to fill Jean-Louis's position.  Gritz Dep. Tr. 163:18–20.

The EEOC issued Jean-Louis a Right-to-Sue letter on March 10, 2008, and she filed a *pro se* complaint with this court on June 16, 2008.  She subsequently retained counsel and, on April 1, 2009, filed an amended complaint that alleged racial discrimination in violation of 42 U.S.C. § 2000e *et seq.* (Title VII of the Civil Rights Act of 1964, or "Title VII"), 42 U.S.C. § 1981 (Civil Rights Act of 1866, or "§ 1981"), and 43 P.S. § 951 *et seq.* (Pennsylvania Human Relations Act, or the "PHRA").  She also alleged that RGIS had violated 43 P.S. § 260.1 *et seq.* (Pennsylvania Wage Payment Collection Law) by not paying her the overtime she deserved.[4]

On April 15, 2009, RGIS filed a Rule 12(b)(6) motion alleging that Jean-Louis's first (Title VII) and third (PHRA) claims were time-barred.  This court issued a memorandum opinion on March 3, 2010, denying RGIS's motion to dismiss.  Before the court now is RGIS's motion for summary judgment and memorandum in support thereof, Jean-Louis's memorandum opposing that motion, and RGIS's reply memorandum in support of its motion.

---

[4] Jean-Louis styles her claim as a violation of the Pennsylvania Wage Payment Collection Law, see Am. Compl. ¶ 42–44, but the substantive claim is that RGIS violated Pennsylvania's minimum wage law.

## II. Discussion

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material for the purpose of summary judgment if it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Id.*  In determining whether a motion for summary judgment should be granted, the court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Stratechuck v. Bd. of Educ.*, 587 F.3d 597, 604 (3d Cir. 2009) (internal quotation marks omitted).  Where, as in this case, "the non-moving party bears the burden of proof at trial, summary judgment is appropriate if [the] non-movant[] fail[s] to 'make a showing sufficient to establish the existence of an element essential to [her] case.'" *In re TMI*, 89 F.3d 1106, 1116 (3d Cir. 1996) (quoting *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993)).  Thus, to survive RGIS's motion for summary judgement, Jean-Louis must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted).

B.  <u>Burden-Shifting Analysis for Racial Discrimination Claims</u>

Jean-Louis alleges that she was discriminated against in three different ways, in violation of three separate laws.  She alleges: (1) disparate treatment; (2) a racially hostile work environment; and (3) unlawful retaliation.  These practices are proscribed by Title VII, § 1981, and the PHRA, and the elements of Jean-Louis's claims are the same under each.  *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999) (holding that the standards for deciding an employer's summary judgment motion in a race discrimination case are the same under Title VII, § 1981, and the PHRA).

Jean-Louis does not allege any direct evidence of racial discrimination but rather alleges that racial animus motivated her former employer's facially race-neutral actions.  Such claims of racial discrimination under Title VII, § 1981, and the PHRA are subject to the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*.  411 U.S. 792, 802 (1973).  The analysis is the same whether the action is brought "under Title VII, § 1981, [or] the PHRA."  *Jones,* 198 F.3d at 410; *see also Schurr v. Resorts Int'l Hotel*, 196 F.3d 486, 499 (3d Cir. 1999) ("In the Third Circuit, the elements of employment discrimination under Title VII are identical to the elements of a section 1981 claim." (internal quotation marks omitted)).  The burden-shifting framework proceeds in three steps.

First, the plaintiff has the burden of establishing a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  Second, if the plaintiff has

10

established a prima facie case, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *Id.*

Finally, if the defendant satisfies its burden of production at the second stage, the plaintiff may survive a motion for summary judgement by "pointing to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Jones,* 198 F.3d at 413.  With regard to the first option, "[t]he plaintiff can discredit the proffered reasons by demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the [defendant] did not act for the asserted non-discriminatory reasons." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 277 (3d Cir. 2010) (alterations in original) (internal quotation marks omitted).

Alternatively, the plaintiff can demonstrate that race was more likely than not a motivating or determinative cause by showing that "the employer has previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998) (citation omitted).

The plaintiff need not assert additional evidence to satisfy the third step of the *McDonnell Douglas* framework: the same evidence that gave rise, prima facie, to an inference of racial discrimination may also be sufficient to convince a reasonable factfinder that racial discrimination motivated the employer's action. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 533 n.8 (1993) ("[T]he evidence previously introduced by the plaintiff to establish a prima facie case and the inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the [employer's] explanation is pretextual." (internal quotation marks omitted)).

C.  Disparate Treatment

To establish a prima facie case of disparate treatment, the plaintiff must show that she (1) "is a member of a protected class"; (2) "was qualified for an employment position"; and (3) "was fired" (4) "'under circumstances that give rise to an inference of unlawful discrimination.'" *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  It is undisputed that Jean-Louis satisfies the first three prongs.  She belongs to a protected class as an African-American, she was qualified for her position as AM, and she was terminated from that position.  The relevant question is whether her termination occurred under circumstances that give rise to an inference of racial discrimination.

Jean-Louis cites a long list of grievances that she claims give rise to such an inference.  *See* Pl.'s Opp'n Mem. at 12–14.  Of nineteen total allegations, fifteen are

examples of alleged unprofessional or inappropriate conduct by Gritz toward Jean-Louis.

For example, Jean-Louis alleges that "Gritz assigned [her] tasks . . . usually performed by

hourly employees," and that "Gritz threw a wad of paper at [her]."   Pl.'s Opp'n Mem. at

12–13.  These claims, if true, suggest that Jean-Louis was treated unfairly, but do not give

rise to an inference of disparate treatment based on race.  Abusive employer actions

unmotivated by race do not establish a case of disparate treatment.  *See Burlington N. &*

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

     Four of the allegations suggest that Jean-Louis was treated more poorly than other

employees.  She alleges that: (1) "Gritz made disparaging comments about [her]" when

"no other Manager was treated that way"; (2) "Gritz repeatedly shorted Plaintiff in the

number of auditors assigned to her inventories as well as the kind of auditors assigned";

(3) she "had [fewer] people assigned [to her] with greater amount of inventory to be

done"; and (4) Gritz made sure Ab[b]oud had the right number of people, and made

adjustments to the schedule for [him]."  Of the three other managers—AM Caleb and

AAMs Abboud and Johnson—two were African-American and one, Abboud, was

Caucasian.

     Drawing all inferences in Jean-Louis's favor, the court finds that these nineteen

allegations, viewed together, could give rise to an inference of racial discrimination.  The

burden on the plaintiff at the prima facie stage is not to prove that she was discriminated

against, but rather to "eliminate the most obvious, lawful reasons for the defendant's

actions." *Pivirotto v. Innovative Systems, Inc*., 191 F.3d 344, 352 (3d Cir. 1999). A

plaintiff may satisfy this burden by demonstrating that "the employer has treated more

favorably similarly situated persons not within the protected class." *Simpson,* 142 F.3d at

645.  The fit in this case is not perfect—Abboud was an AAM while Jean-Louis was an

AM, and two of the similarly situated persons allegedly treated more favorably than Jean-

Louis were within the same protected class—but, drawing inferences in Jean-Louis's

favor, she has sufficiently alleged that Abboud, a man outside of her protected class with

substantially similar duties, was treated more favorably than she.  Accordingly, the court

proceeds to the second step in the *McDonnell Douglas* framework.

At the second step, the burden of production shifts to the defendant to introduce

"evidence which, taken as true, would permit the conclusion that there was a

nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*,

32 F.3d 759, 763 (3d Cir. 1994).  This a "relatively light burden": "[t]he employer need

not prove that the tendered reason *actually* motivated its behavior."  *Id.* (emphasis in

original).  Here, RGIS documented a number of reasons for Jean-Louis's dismissal that,

taken as true, are legitimate and non-discriminatory.  Jean-Louis's first and second PIP

contain a combined 49 examples of unprofessional behavior.  These reasons, taken as a

whole, are sufficient to meet RGIS's burden of production at the second step.

At the third step, Jean-Louis does not attempt to discredit RGIS's proffered

reasons for terminating her.  Rather, she admits to the factual accuracy of most of Gritz's

concerns, but argues that race was more likely than not the cause of her alleged

mistreatment because "similarly situated persons [were] treated more favorably" than she.

Pl.'s Opp'n Mem. at 14.  Jean-Louis does not explain why such evidence is relevant—she

declined the court's invitation to file a surreply addressing RGIS's allegedly non-

discriminatory reasons for terminating her—but it may be that she has in mind language

in *Fuentes*, which states that a plaintiff "may defeat a motion for summary judgment by

. . . [showing] that [the defendant] had treated other, similarly situated persons not of [the

plaintiff's] protected class more favorably."  32 F.3d at 764–65 (internal quotation marks

omitted).  In support of this proposition, Jean-Louis argues in her opposition

memorandum that Abboud was treated more favorably than she and offers two pieces of

evidence to substantiate this claim: (1) the work schedule from November 3, 2006, to

November 10, 2006, which allegedly demonstrates that Abboud had more favorable work

conditions, Docket No. 54 Ex. 2; and (2) accounts from three RGIS employees who

reportedly witnessed Gritz assigning Abboud more numerous and capable auditors than

he was assigning Jean-Louis, Jean-Louis Dep. Tr. 2 166:1–169:13.[5]

---

[5] None of the witnesses has been deposed, and none has submitted an affidavit.
Rather, Jean-Louis reports overhearing auditors Tamala Goard and Mya Worthem
complaining that Abboud's "store was a lot smaller and he had more people and [Jean-
Louis's] store was a lot bigger and had less people."  Jean-Louis Dep. Tr. 2 168:10–13,
167:8–14.  Similarly, she states that Johnson witnessed Gritz giving Jean-Louis more
work than Abboud while giving Jean-Louis less assistance.  Jean-Louis Dep Tr. 2
148:4–149:4.  While these hearsay accounts would not be admissible at trial, evidence
presented by a party opposing summary judgment need not be "in a form that would be
admissible at trial."  *Celotex Corp.*, 477 U.S. at 324 (1986). So long as the *content* is

RGIS argues that Jean-Louis has not met her burden at the third stage because her evidence, if believed, is legally insufficient to establish that a similarly situated person was treated more favorably.  Specifically, RGIS contends that: (1) Jean-Louis may not selectively pick Abboud as her comparator; (2) Abboud is an inappropriate comparator because he was an AAM while Jean-Louis was an AM; (3) Jean-Louis's evidence is insufficient to establish that Abboud was treated more favorably; and (4) the overall context of Jean-Louis's hiring and firing dispels an inference of racial discrimination. Each argument is considered in turn.

First, RGIS contends that Jean-Louis "cannot pick and choose her comparator (Mr. Abboud) when the group of [AMs], [AAMs,] and Team Leaders as a whole are primarily African-American."  Def.'s Reply Mem. at 7.  This argument misapprehends the holding in *Simpson*, which held that the plaintiff's "reliance on a single member of the non-protected class is insufficient to give rise to an inference of discrimination when [the plaintiff] was treated the same as thirty-four members of the non protected class."  142 F.3d at 646.  Thus, a plaintiff cannot pick a comparator while "ignor[ing] a significant group of comparators who were treated equally or less favorably than she."  *Id*. at 647.

---

"capable of being admissible at trial" then hearsay evidence offered by the nonmoving party is properly considered in resolving a motion for summary judgment.  *Petruzzi's IGA Supermarkets v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1235 n.9 (3d Cir. 1993). Direct testimony from Goard, Worthem, and Johnson paralleling the hearsay testimony would of course be admissible at trial because they witnessed the alleged disparity themselves, and is therefore properly considered at this stage.

Jean-Louis has not ignored a significant group of comparators: Abboud is the only manager who is a member of the non-protected class. Jean-Louis's use of him as a comparator is not "pick[ing] and choos[ing]," but is rather compelled by the demographics of the managers in question at RGIS. Def.'s Reply Mem. at 7. *Simpson* does not insulate businesses employing only one member of a non-protected group from disparate treatment claims alleging favorable treatment of that employee.

Second, RGIS argues that Abboud is not "similarly situated" because he worked as an AAM while Jean-Louis was an AM. In support of this proposition, RGIS points to Jean-Louis's admission that Abboud was "junior" to her, but offers little other differentiation between the positions. Jean-Louis Dep. Tr. 2 164:4–9; *see also id.* at 148:19–14 ("[E]ven though our [Abboud and Jean-Louis] positions were different . . . we still have the same type of stores."). Gritz also makes little distinction between the positions: when asked about the difference between an AM and AAM, he responded only that "[an AAM] gets overtime." Gritz Dep. Tr. 166:17–20. This viewpoint is supported by the District Master Calendar, which lists AMs and AAMs interchangeably as supervisors, and differentiates between the two only by noting that AMs are salaried while AAMs are not. Docket No. 54 Ex. 2.

The Third Circuit has held that in the "workplace disciplinary and/or personnel actions" context, the relevant factors for determining whether employees are similarly situated include a "showing that the two employees dealt with the same supervisor, were

17

subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *McCullers v. Napolitano*, No. 10-1461, 2011 WL 1807371, *4 (3d Cir. May 12, 2011) (citing *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617–18 (7th Cir. 2000)).  It is uncontested that Jean-Louis and Abboud both reported to the same supervisor, and there is no suggestion that the two were subject to different standards—their common supervisor, when asked about the difference between the jobs, differentiated between the positions only with respect to compensation.  And there is no evidence in the record that would "distinguish their conduct or the employer's treatment of them."[6]  Accordingly, the court finds that, taking the evidence in the light most favorable to Jean-Louis, Abboud and Jean-Louis were similarly situated.

Third, RGIS argues that Jean-Louis's allegations concerning Abboud's favorable treatment were "too vague and conclusory to establish an inference of discrimination." Def.'s Reply Mem. 7.  The argument is not persuasive.  Jean-Louis has substantiated her

---

[6] RGIS does not argue that Jean-Louis's conduct distinguished her from Abboud. *See* Def.'s Mot. Mem. (not addressing Jean-Louis's disparate treatment claim); Def.'s Reply Mem. (arguing that position, not conduct, differentiate Abboud and Jean-Louis). Jean-Louis alleges in her EEOC complaint that Abboud "had similar performance issues," Docket No. 54 Ex. 5, and again her complaint with this court that "[s]imilarly situated white workers with less favorable scores than [Jean-Louis]" were treated more favorably than she.  Am. Compl. at ¶ 15.  RGIS responds by documenting a number of missteps allegedly made by Jean-Louis, but says nothing of Abboud's performance.  This showing is insufficient to rebut Jean-Louis's evidence supporting the claim that she and Abboud are similarly situated.

claim by identifying three witnesses who can testify to the disparity in treatment.  She also

points to the RGIS calendar from the week of November 4, 2006, which allegedly

demonstrates that Abboud had a more favorable work schedule.  *See* Docket No. 54 Ex.

5.  The calendar, by itself, is not particularly persuasive—one cannot draw any

meaningful conclusions from one week without any context—but it does show that Jean-

Louis worked more often and worked outside of Philadelphia more frequently than

Abboud.  Each of these observations is susceptible to multiple interpretations, but, when

considered alongside witness testimony, could lead a reasonable factfinder to conclude

that Abboud was being treated better than Jean-Louis.  She has not, as a matter of law,

failed to demonstrate that Abboud was treated more favorably.

Fourth, and finally, RGIS points out that RGIS hired Jean-Louis to replace a

Caucasian man, and replaced her with an African-American woman.  This, RGIS argues,

when considered alongside the fact that "nearly all of the [AMs], [AAMs,] and Team

Leaders under Gritz were also African-American," dispels any inference of racism.

Def.'s Reply Mem. at 8.  This argument is also unpersuasive.  While these circumstances

certainly have some probative value, they do not compel the conclusion that Jean-Louis

was not discriminated against because of her race.  A reasonable jury could conclude that

RGIS hired Jean-Louis to use her skills for a year while a Caucasian manager was being

groomed for the position.  *See Waldron*, 56 F.3d at 496 n.6 (refusing to give presumptive

value to the fact that the same person hired and fired the employee).  Similarly, that Jean-

Louis was replaced by an African-American does not compel the conclusion that she was not discriminated against on account of her race.  As the Third Circuit put it in an analogous Title VII action alleging gender discrimination, "an employer may treat women less favorably than men, but still be willing to hire a woman to fill a position left vacant by the firing of a discriminated-against woman."  *Pivirotto,* 191 F.3d at 355. Accordingly, Jean-Louis is not required to show that she was replaced by a person outside of her protected class to make out a prima facie case of disparate treatment.  *Id.* at 354.

Furthermore, evidence that other African-Americans were not discriminated against does not necessarily undermine Jean-Louis's claim.  Freedom from discrimination is "an individual rather than a group entitlement."  *Simpson*, 142 F.3d at 646 (quoting *Bush v. Commw. Edison Co.*, 990 F.2d 928, 931 (7th Cir. 1993)).  Jean-Louis need not demonstrate that *every* African-American at RGIS was discriminated against, only that she was.  She has met this burden by presenting evidence that, if believed, demonstrates that Abboud, a similarly situated member outside of her protected class, was treated more favorably than she.  Summary judgment on this claim is inappropriate and defendant's motion will, as to this claim, be denied.

D.  Hostile Work Environment

To establish a prima facie case of a hostile work environment, Jean-Louis must show that: "(1) [s]he suffered intentional discrimination because of h[er] [race]; (2) the discrimination was pervasive and regular; (3) it detrimentally affected h[er]; (4) it would

20

have detrimentally affected a reasonable person of the same protected class in his

position; and (5) there is a basis for vicarious liability."  *Caver v. City of Trenton,* 420

F.3d 243, 262 (3d Cir. 2005) (third alteration in original).

Workplace harassment does not necessarily create a hostile work environment.

Title VII "does not set forth a general civility code for the American workplace."

*Burlington N.*, 548 U.S. at 68 (internal quotation marks omitted).  The harassment must

be "sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment

and create an abusive working environment."  *Meritor Sav. Bank, FSB v. Vinson*, 477

U.S. 57, 67 (1986) (internal quotation marks omitted).  To establish this element, the

plaintiff must demonstrate that  she "subjectively perceive[s] the environment to be

hostile or abusive," *and* that "a reasonable person would have the same perception."

*Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 715 (3d Cir. 1997).  "Conduct that is

not severe or pervasive enough to create an objectively hostile or abusive work

environment—an environment that a reasonable person would find hostile or abusive—is

beyond Title VII's purview."  *Harris v. Forklift Sys., Inc.* 510 U.S. 17, 21 (1993).

Considerations relevant to determining the severity and pervasiveness include "the

frequency of the discriminatory conduct; its severity; whether it is physically threatening

or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with

an employee's work performance."  *Id.* at 23.

Claims of disparate treatment and racially hostile work environment both allege

unlawful discrimination, but are substantially different causes of action: a "disparate treatment claim require[s] a plaintiff to prove an adverse employment consequence and discriminatory intent by his employer," while a "hostile environment claim require[s] the plaintiff to show that his work environment was so pervaded by racial harassment as to alter the terms and conditions of his employment." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 768 (1998). Jean-Louis has not presented evidence sufficient to conclude that a reasonable person would find working at RGIS to be racially hostile or abusive. She makes a number of allegations—most notably, that Gritz threw a wad of paper at her and told her to "suck his private parts"—but does not establish that she was treated this way because of her race. She presents no direct evidence of racial animus, nor does she present indirect evidence from which a reasonable factfinder could conclude that Gritz treated her the way he allegedly did because of her race.

The court draws a distinction here between the conduct alleged in support of Jean-Louis's disparate treatment claim and her hostile work environment claim. In support of the former, Jean-Louis alleges that Abboud got better hours and more help than she did. This comparison between similarly situated persons supports a reasonable inference of racial discrimination. Jean-Louis does not support her hostile work environment claim with analogous evidence. She simply alleges that Gritz treated her poorly. This claim, without more, does not make out a racially hostile work environment claim. *See Sgro v. Bloomberg L.P.*, 331 F. App'x 932, 941 (3d Cir. 2009) ("Hostile work environment

claims . . . are designed for work environments characterized by an excess of discriminatory ridicule or other intimidating behavior.").  That Jean-Louis "experienced personality conflicts resulting in a less than ideal work environment is simply not actionable under Title VII." *Fairclough v. Wawa, Inc.*, 412 F. App'x 465, 469 (3d Cir. 2010).  Because Jean-Louis has failed to establish a prima facie case of hostile work environment, RGIS's motion for summary judgment will, as to that claim, be granted.

E. Retaliation

To establish a prima facie case of retaliation, Jean-Louis must show that: (1) she engaged in protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.  *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010).  A complaint is protected if it is either made within the anti-discrimination acts' "statutory processes[es]" for opposing unlawful discrimination, or if it "explicitly or implicitly alleged that a protected characteristic was the basis for [an] adverse employment action." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 134–135 (3d Cir. 2006) (internal quotation marks omitted).

Jean-Louis contends that her internal complaints to HR were protected activity within the scope of Title VII, § 1981, and the PHRA.  *See* Am. Compl. at ¶ 22–40.  But neither complaint made any express reference to racial discrimination.  In her first

internal complaint, Jean-Louis alleges that Gritz "cursed at her on several occasions, threaten[ed] to terminate her employment[,] and undermines her authority in front of customers and team members," but does not attribute this treatment to her race.  Docket No. 52 Ex. 9.  Similarly, her second internal complaint documents "inappropriate and verbally abusive" comments by Gritz, but does not connect those comments to her race. Docket No. 52 Ex. 10.

Nonetheless, Jean-Louis contends that "she engaged in protected activity" because she complained about the "work conditions she was given as compared to similarly situated white counterparts."  Pl.'s Opp'n Mem. at 15.  The record, however, does not support her argument.  At the time she made her first internal complaint, Jean-Louis characterized her dispute as a "personal conflict with [Gritz]," Docket No. 52 Ex. 9, and in neither complaint did she claim that she was treated more poorly than other employees. *See* Docket No. 52 Ex. 9 & 10.  Furthermore, Jean-Louis does not dispute that RGIS's internal records of her complaints were complete and accurate.  The closest her complaints come to alleging racial discrimination is her contention that "[Gritz] is trying to jeopardize her employment in order to promote another employee to the AM position." Docket No. 52 Ex. 9.  This statement alleges racial discrimination only if the court assumes (a) that there was a specific employee in mind who was not African-American, and (b) that Jean-Louis's complaint was understood to allege that racial bias was motivating Gritz's purported preference for that other employee.  There is no evidence in

24

the record to support either proposition.

Jean-Louis's complaints to HR neither explicitly nor implicitly allege that race motivated Gritz's actions.  They are merely "general complaint[s] of unfair treatment" and, therefore, not protected activities.  *Curay-Cramer*, 450 F.3d at 135.  A claim of retaliation cannot be supported without a protected activity, and, therefore, summary judgment for the defendant is appropriate.

F.  Overtime

Jean-Louis alleges that RGIS violated the Pennsylvania Minimum Wage Act ("PMWA") by not paying her overtime.[7]  43 P. S. § 333.101 *et seq.*  Under the PMWA, an employee working in an "executive, administrative, or professional capacity" is not entitled to overtime wages when she works in excess of forty hours in a week.  43 P.S. § 333.105(a)(5).  The term executive capacity is defined in 34 Pa. Code § 231.82, which provides that, among other things,

> an employee who is compensated on a salary basis at a rate of not less than $250 per week, exclusive of board, lodging or other facilities, and whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein shall be deemed to meet all the requirements of this section.[8]

---

[7] This court exercises supplemental jurisdiction over this state law claim because it is "part of the same case or controversy" as the federal law claims.  28 U.S.C. § 1367.

[8] This is the so-called "short test."  *See McGrath v. City of Philadelphia*, 864 F. Supp. 466, 484 (E.D. Pa. 1994).  The executive exemption also applies under other

34 Pa. Code § 231.82(6).

It is undisputed that Jean-Louis satisfies the first and third prong of this test.  She made $33,800 per year ($650 per week) as an AM, and she regularly supervised between ten and fifteen employees.  Her compensation claim therefore turns on whether Jean-Louis's "primary duty" was "management."  *Id.*  The PMWA does not define the term management, and the court therefore turns to the Fair Labor Standards Act ("FLSA") for guidance.  *See Commw., Dep't of Labor & Indus., Bureau of Labor Law Compliance v. Stuber*, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003) (citing the FLSA in its interpretation of the PMWA because "the state and federal acts have identity of purpose").[9]  According to the FLSA,

> 'management' includes, but is not limited to, activities such as . . . directing the work of employees; . . . appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; . . . disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; . . . [and] controlling the flow and distribution of materials or merchandise and supplies . . . .

29 C.F.R. § 541.102.  As a general rule, an employee's "primary duty" is management if

---

circumstances, enumerated in 34 Pa. Code § 231.82(1)–(5), that are not implicated in this case.

[9] The FLSA and PMWA contain substantially similar language defining an executive employee.  *See* 34 Pa. Code § 231.82(6) ("primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof"); 29 C.F.R. § 541.100(a)(2) ("primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof").

she spends "the major part, or over 50% of his or her time" engaged in managerial

activities.  *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 699 (3d Cir. 1994).  Other factors

to be considered include "the importance of the duties when compared to other types of

duties, the frequency with which the employee exercises discretionary powers, freedom

from supervision, and pay relative to other employees."  *Id.*

Applying these factors to Jean-Louis's self-described position, the court concludes

that RGIS properly classified her work as exempt under the PMWA.  As an AM, Jean-

Louis was the most senior RGIS employee at a given job site and was therefore generally

free from direct supervision.  She addressed customer concerns as they arose, and served

as the liaison between RGIS and its customers.  Jean-Louis also served as the on-site

supervisor: she testified that her "primary duty" at an audit was to supervise auditors,

Jean-Louis Dep. Tr. 2 28:7–10, and that she spent "[t]he majority of [her] time" doing so,

*id.* at 26:19–27:10.  In this supervisory role, Jean-Louis was responsible for both

disciplining employees who violated RGIS policies, and for identifying and training

"auditors who [she] thought had the potential to be team leads."  *Id.* at 16:15–26:5.  She

was also responsible for developing a plan for the audits, directing where and how the

auditors worked, and ensuring that all necessary equipment was available.

Viewing the facts in the light most favorable to Jean-Louis, the court concludes

that her primary duty was managing.  Accordingly her position was properly classified

under Pennsylvania law and RGIS's motion for summary judgment as to the overtime

27

claim will be granted.

**III.    Conclusion**

For these reasons, RGIS's motion for summary judgment will be denied on Jean-Louis's disparate treatment claim, and granted on all other claims.  An appropriate order accompanies this opinion.